IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and **ARTHUR H. BUNTE, JR.**, Trustee, <br><br> Plaintiffs, <br><br> v. <br><br> **E. LOUISE CARDWELL**, an individual, <br><br> Defendant. | Case No. 12 C 7715 |

## MEMORANDUM OPINION AND ORDER

Central States, Southeast and Southwest Areas Pension Fund and its Trustee Arthur H. Bunte, Jr., (collectively "Fund," treated as a singular noun for convenience) seek summary judgment against E. Louise Cardwell ("Cardwell") (1) as transferee of some very valuable real estate on the liquidation of her wholly-owned corporation Healy Spring Company ("Healy Spring"), which had been a Fund contributor and had incurred withdrawal liability on its cessation of business and of its activity as such contributor and (2) as an alleged violator of the Minnesota Uniform Fraudulent Transfer Act ("Minnesota Act") by reason of that transfer. Cardwell, with her hand having been caught in the cookie jar (or less figuratively, with her having received that parcel of real estate -- then the sole asset of her company Healy Spring -- as a liquidating distribution right after the corporation was sued for a large ERISA withdrawal liability that it owed to Fund), has filed a totally inadequate response to that motion. Accordingly, for the reasons stated in this memorandum opinion and order, Fund's motion is granted.

Because Cardwell has admitted all but six of the paragraphs in Fund's LR 56.1(a)(3) Statement of Material Facts ("Fund Statement"),[1] and because the six non-admissions either (1) are wholly at odds with Cardwell's own admissions during her deposition testimony or (2) otherwise flout the objective facts in the Fund Statement to which she purports to offer her responses, this opinion adopts the Fund Statement (attached as Ex. A) rather than having to reinvent the wheel. What remains in large part for this opinion is to analyze the main question on which the parties cross swords: whether the transfer of the real estate to Cardwell was in repayment of a debt or was instead a distribution of the only remaining corporate capital asset to Cardwell as Healy Spring's sole stockholder. And embodied in that issue is the question whether its resolution poses a question of law or a genuine issue of material facts that could forestall summary judgment.

In both those respects Cardwell seeks to lay heavy stress on the "loan" of $117,635 made to Healy Spring back on March 31, 1975 by Cardwell and her husband Phillip (the two were then the corporation's sole stockholders as well as being two of its three directors, the other being a likely relative, John Cardwell).[2] But when that transaction is analyzed (as Cardwell has not done, instead advancing her contention by a mere ipsi dixit), it reveals that the label self-imposed by the Cardwells as Healy Spring's sole stockholders is nothing more than an illustration of the home truth traditionally attributed to Abraham Lincoln:

---

[1] Only Cardwell's responses to Fund Statement ¶¶ 18, 30, 32, 35, 40 and 41 say anything other than "Defendant does not dispute the Plaintiff's Statement contained in paragraph --."

[2] See Ex. B attached to this opinion, the corporate minutes of the 1975 action taken without a meeting (a common practice with such a closely-held corporation).

> If you call a tail a leg, how many legs has the dog? 5? No, calling a tail a leg don't <u>make</u> it a leg.

Although Cardwell has told nothing about the financial structure of Healy Spring at that remote date nearly four decades ago, its corporate tax return for its final year of active operation ended September 30, 2007 (Fund Statement Ex. F) reveals (1) that its sole capitalization was $18,000 in common stock and (2) that it then had $40,000 listed as "loans from shareholders."[3] To hark back to the March 1975 transaction, what is plain is that the corporation could not then "pay all costs of purchasing and building the real estate constituting the new facility of the Corporation" (the language of the 1975 stockholders' minutes) without a then-negotiated $80,000 bank mortgage loan plus the $117,635 coming from the Cardwells. Anyone with any experience in corporate representation would recognize Healy Spring as the prototypical thinly-capitalized corporation, with the Cardwells making a prototypical capital contribution to enable that corporation to acquire a capital asset.

"Loan or capital contribution?" problems are most typically encountered in the income tax environment, where the issue is sometimes whether a payment from corporate funds to a corporate insider includes deductible interest or is instead a non-deductible dividend, or at other times is whether the principal portion of such a payment is nontaxable to the recipient as

---

[3] Fund Statement ¶¶ 19 through 27, all uncontested by Cardwell, identify a series of amounts transferred from Cardwell's own bank account into Healy Spring's bank account during the time frame from March 31, 2004 until February 9, 2008, the bulk of which transfers were made during the last year of that period -- and Cardwell also admits Fund Statement ¶ 33, which is based on her deposition testimony and states:

> Healy Spring would not have been able to pay its bills if Cardwell had not advanced monies to the company and would not have been able to survive.

repayment of a loan or is instead a taxable dividend because the so-called "loan" was really a capital contribution.[4] Unsurprisingly, then, the best treatment of the subject in this circuit is set out in Judge Bauer's opinion for the Court of Appeals' panel in an income tax case, In re Larson, 862 F. 2d 112 (7th Cir. 1988), which examined the issue after having referred to a split in appellate decisions on the fact v. law issue, with our Court of Appeals having earlier characterized the question as to one of law in Saviano v. Comm'r, 765 F. 2d 643, 646 (7th Cir. 1985).

Because the congruence of the current situation with a number of facets of the Larson opinion would allow some of those facets to have been written specifically for the current case after some modest editing, it is worthwhile to quote at some length from Judge Bauer's treatment for the panel there. Here is some of the relevant language from Larson, where as here a husband and wife were the principal stockholders in a closely held corporation and took the position that they had purportedly "loaned" funds to their corporation (receiving a promissory note in return, just as the Cardwells did here in their 1975 transaction) rather than their having made contributions to its capital. Here is Larson in part (862 F. 2d at 117):

> Certainly investors often contribute large sums of capital to corporations. This is so because such transfers, though characterized as "contributions to capital," are not "contributions" in the sense of charitable donations. The distinction between a capital investor and a creditor is not that the latter expects repayment while the former does not. It is that the creditor expects payment regardless of the debtor corporation's success or failure, while the investor expects to make a profit (hoping for a larger profit than the creditor will make in interest) if, as he no doubt devoutly wishes, the company is successful.

---

[4] Less frequently the same problem arises in the bankruptcy context, in which third party creditors seek to subordinate a so-called stockholder "loan" to the corporate obligations to those creditors.

\* \* \*

Moreover, Pharmaco was thinly capitalized, with a total capitalization of only $25,000, and had a debt-to-equity ratio of over 43 to 1 (not considering any debt but the advances made by Larson). Finally, the court found that it was doubtful that Pharmaco could have obtained a similar loan from an independent lending institution. All of these were proper considerations and all pointed in the direction of capital contributions rather than loans.

Here the posture of Cardwell vis a vis Healy Spring was strikingly parallel to that described in the "Finally . . ." sentence just quoted from <u>Larson</u>: Cardwell herself expressly testified that no efforts were made to obtain bank financing before her transfers to Healy Spring because "That wouldn't be possible . . . because of our financial condition" (Cardwell Dep. 24, cited at Fund Statement ¶ 40). Cardwell's counsel advances the lame response to Fund Statement ¶ 40 that Cardwell "would have no knowledge of what an outside lending institution would do." That of course misses the entire point, because Cardwell's frank acknowledgement of the reason for not going to an outside source buttresses the fact of Healy Spring's thin capitalization and its hand-to-mouth existence -- really conclusive evidence that capital contributions and not loans were involved.

That less than makeweight purported response is all of a piece with the few other instances in which Cardwell asserts anything other than that she "does not dispute the Plaintiff's statement." Here are those other instances:

1. Cardwell's response to Fund Statement ¶ 18 attempts to buttress the purported (but misleading portrayed) bona fides of the 1975 transfer of $117,635 from Cardwell's bank account to Healy Spring's bank account as a claimed loan rather than a capital contribution -- an assertion that has already been torpedoed here.

2.  Cardwell's response to Fund Statement ¶ 30 deals only with the documentation regarding the 1975 transaction -- and once again what has been said to this point renders that irrelevant.

3.  Cardwell's response to Fund Statement ¶ 32 deals with interest paid on the funds supplied in 1975, as to which Cardwell testified that she collected interest but could not answer from memory just how much had been paid. Under the circumstances already addressed here, which overwhelmingly confirm that the transaction was a capital contribution rather than a true loan, that provides no meaningful traction in the other direction.

4.  Cardwell's response to Fund Statement ¶ 35 states that the repayments on the 1975 transaction confirm that "The main issue of loan v. capital contribution, therefore, relates principally to the 1975 loan." True enough, but Cardwell has clearly lost on that one.

5.  Finally, Cardwell's response to Fund Statement ¶ 41 advances a quibble that again does nothing to undercut this opinion's analysis to this point.

Accordingly, what was stated earlier as to Cardwell's failure to have identified any genuine issue of <u>material</u> fact in opposition to summary judgment remains intact.

In many ways, however, the most puzzling of the parties' submissions on the current motion is their failure to focus on Cardwell's impermissible self-dealing and the economic consequences of that course of conduct. After Healy Spring incurred its statutorily imposed withdrawal liability, Fund filed suit against it on May 2, 2008 in Case No. 08 C 2515. Cardwell was served with the summons and complaint on May 14 of that year, and on December 18, 2008 Fund obtained a consent judgment against Healy Spring in the amount of $243,479.93.

Meanwhile no instruments of indebtedness had been contemporaneously executed when any of the alleged post-1975 "loans" were made (three during 2004, four during 2007 and two during 2008) -- it was not until sometime after February 9, 2008 that Cardwell's counsel drafted ten promissory notes covering those "loans."[5]  By May 1, 2008 the purported loans from Cardwell aggregated some $210,000.

By that time the only remaining asset of Healy Spring after it had ceased operations was the real estate at 990 Central Avenue Northeast, Minneapolis (where it had operated its business) -- it had sold its operating equipment to a former employee for $16,000, the proceeds of which were used to pay Healy Spring's outstanding bills.  But on May 15, 2008 -- just one day after Cardwell had accepted service of the summons and complaint against Healy Spring based on the company's withdrawal liability -- she caused the corporation to transfer that "Central Avenue Property" to herself -- and just over four months later she sold the property for $495,000!  With some $120,000 of that amount being applied to pay off a Wells Fargo Bank mortgage on the property and another $43,000 being applied to pay taxes, fees and expenses, Cardwell retained $332,330.17 for herself.

It is of course black letter law (even litigation lawyers should be expected to retain that much of their law school education) that on dissolution of a corporation its stockholders are entitled to receive only the remaining equity in their corporation, bearing personal responsibility to the corporate creditors for any corporate liabilities that should have been satisfied before the distribution of assets on dissolution.  So even if Cardwell had been right on the subject of loans

---

[5]  As stated earlier, Healy Spring's corporate tax return for the fiscal year ended September 30, 2007 (the last full year of corporate operations) reflected only $40,000 as "loans from shareholders."

v. contributions (as she is not), more than $120,000 of what she realized from the sale of the Central Avenue Property on a best-case basis from her point of view ($332,330.17 less the $210,000 in purported "loans") should have been applied in partial payment of the $243,479.93 consent judgment against Healy Spring. And if the only even arguable "loan" had been the one made in 1975 (there being no conceivable way that the smaller loans from 2004 through early 2008 to keep the company afloat could reasonably be treated as anything other than capital contributions), the amount that Cardwell would have had to pay Fund toward the consent judgment liability would have been at least some $215,000 ($332,330.17 less whatever remained outstanding of the original $117,635).

All of this plainly establishes fraud on Cardwell's part in blatant violation of several provisions of the Minnesota Act. There is no rational basis on which she can have believed that she was entitled to retain the windfall represented by the receipt of such a valuable asset free and clear of the portion (at a minimum) of a judgment that the law made her personal liability on the dissolution of, and distribution from, Healy Spring.

As against those incontrovertible facts, Cardwell offers only the legally feeble argument that she also entered into a Security Agreement on February 15, 2008 (contemporaneously with the belated preparation of the set of promissory notes) and that the Central Avenue Property was within the scope of that Security Agreement. Although the parties differ in that respect (Fund urges that the Security Agreement was never recorded against the Central Avenue Property), it is unnecessary to decide that question because of the crystal-clear applicability of the Minnesota

Act even under Cardwell's best-case scenario. It is unnecessary to cite more than the criteria established by the Minnesota Act[6] to demonstrate that:

1. Under its Section 45(a) a transfer is fraudulent if (1) the creditor's claim arose before the transfer, (2) the transfer was made without receiving a reasonably equivalent value in exchange for the transfer and (3) the debtor was insolvent at the time of the transfer.

2. Under its Section 45(b) a transfer is fraudulent if (1) the creditor's claim arose before the transfer, (2) the transfer was made to an insider for an antecedent debt, (3) the debtor was insolvent at the time of the transfer and (4) the insider had reasonable cause to believe the debtor was insolvent.

3. Under its Section 44(a) a transfer is fraudulent if the debtor made the transfer (1) with actual intent to hinder, delay or defraud any creditor or (2) without receiving a reasonably equivalent value in exchange for the transfer and if the debtor believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

Unlike the complexity of having to cope with the fabled Hydra, it is necessary only once to find a transfer fraudulent (or to hold its transferor liable). And as shown above, Cardwell was clearly the beneficiary of a fraudulent transfer from several perspectives. In sum, Fund has established the absence of any genuine issue of material fact that could block summary judgment in its favor on the separate and independent ground of violation of the Minnesota Act.

---

[6] Because all of the provisions of the Minnesota Act are found in Minn. Stat. § 513, the citations in the text will simply take the form "Section --," omitting the prefatory "513." that precedes those section numbers.

**Conclusion**

For the reasons set out in some detail in this opinion, there are no genuine issues of material fact that would block Fund's Rule 56 motion for summary judgment, and it is accordingly entitled to such a judgment as a matter of law. This action is set for a status hearing at 8:45 a.m. June 13, 2014 to discuss what further proceedings are needed to conclude the case.

                                               Milton I. Shadur
                                               Senior United States District Judge

Date: June 6, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and ARTHUR H. BUNTE, JR., trustee,<br><br>Plaintiffs,<br><br>v.<br><br>E. LOUISE CARDWELL, an individual,<br><br>Defendant. | Case No. 12 C 7715<br><br>Judge Milton I. Shadur |

**PLAINTIFFS' LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS**

NOW COME Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund (the "Fund") and Arthur H. Bunte, Jr., Trustee (collectively, "Central States"), by and through their counsel, and hereby submit Plaintiffs' L.R. 56.1(a)(3) Statement of Material Facts.

A. **The Parties**

1. The Fund is a multiemployer pension plan. (Ex. A - Answer to Complaint ("Answer"), ¶ 2).

2. Arthur H. Bunte, Jr. is a trustee of the Fund and he and his fellow trustees are the plan sponsor of the Fund. (Ex. A - Answer, ¶ 3).

3. Elizabeth Louise Cardwell ("Cardwell") is an individual who resides in the State of Minnesota. (Ex. A - Answer, ¶ 5).

B. **The Fund's Judgment Against Healy Spring Company**

4. Healy Spring Company ("Healy Spring") is or was a corporation organized under the laws of the State of Minnesota. (Ex. A - Answer, ¶ 10). Healy Spring ceased operations on

November 7, 2007. (Ex. B - Deposition of Elizabeth Louise Cardwell ("Cardwell Dep."), 7:20-8:2).

5. From approximately 1975 until present, Cardwell was the vice-president of Healy Spring. (Ex. B - Cardwell Dep., 7:9-19).

6. Since her husband's death in 1997, Cardwell has been the sole shareholder of Healy Spring. (Ex. A - Answer, ¶ 11; Ex. B - Cardwell Dep., 6:7-7:8).

7. Prior to her husband's death in 1997, Cardwell and her husband were the sole shareholders of Healy Spring. (Ex. B - Cardwell Dep., 6:7-7:8).

8. During all relevant periods of time, Healy Spring was bound by collective bargaining agreements with a certain Teamsters local union under which Healy Spring was required to make contributions to the Fund. (Ex. A - Answer, ¶ 12).

9. The Fund determined that on or about November 16, 2007, Healy Spring permanently ceased to have an obligation to contribute to the Fund and/or permanently ceased all covered operations, thereby effecting a "complete withdrawal" from the Fund within the meaning of 29 U.S.C. § 1383. (Ex. A - Answer, ¶ 13).

10. As a result of this complete withdrawal, Healy Spring incurred withdrawal liability to the Fund in the principal amount of $191,560.56 (the "Withdrawal Liability"). (Ex. A - Answer, ¶ 14).

11. On or about January 29, 2008, Healy Spring received the Fund's notice and demand for payment of the Withdrawal Liability. (Ex. A - Answer, ¶ 15).

12. On May 2, 2008, the Fund filed suit against Healy Spring in a case styled *Central States, Southeast and Southwest Areas Pension Fund, et al. v. Healy Spring Company*, Case No.

08 CV 2515 (N.D.Ill.)(Andersen, J.) seeking to collect the outstanding Withdrawal Liability assessment (the "Healy Spring Lawsuit"). (Ex. A - Answer, ¶ 17).

13. On May 14, 2008, the summons and complaint for the Healy Spring Lawsuit was served on Cardwell, as vice-president of Healy Spring. (Ex. C – Summons; Ex. B - Cardwell Dep., 72:9-17).

14. On December 18, 2008, the Fund obtained a consent judgment against Healy Spring in the amount of $243,479.93 (the "Consent Judgment"). (Ex. A - Answer, ¶ 18).

15. To date, Healy Spring has not made any payments with respect to the Consent Judgment. (Ex. A - Answer, ¶ 19).

### C. The Promissory Notes and Security Agreement

16. During various times during its operations, Healy Spring encountered financial difficulties, which required that it obtain money from outside sources. (Ex. B - Cardwell Dep., 23:12-24:13; 28:3-4; 29:4-11; 31:5-8; 33:20-22; 35:2-3; 36:25-37:5; 40:21-41:5; 43:6-14).

17. Cardwell made several money advances to Healy Spring because Healy Spring had outstanding bills, however, Cardwell was unable to provide specifics about the outstanding bills. (Ex. B - Cardwell Dep., 23:12-16; 29:4-11; 36:22-37:14; 40:17-41:5; 43:6-19).

18. On March 31, 1975, Cardwell transferred $117,635.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 17:3-7).

19. On March 31, 2004, Cardwell transferred $5,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 22:9-16).

20. On October 31, 2004, Cardwell transferred $10,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 27:24-28:2).

21. On November 30, 2004, Cardwell transferred $10,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 28:25-29:3).

22. On May 1, 2007, Cardwell transferred $15,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 31:1-4).

23. On October 11, 2007, Cardwell transferred $10,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 33:16-19).

24. On November 7, 2007, Cardwell transferred $15,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 34:23-35:1).

25. On November 12, 2007, Cardwell transferred $15,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 36:22-24).

26. On January 14, 2008, Cardwell transferred $5,000.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 40:17-20).

27. On February 9, 2008, Cardwell transferred $6,500.00 from her own bank account into Healy Spring's bank account. (Ex. B - Cardwell Dep., 42:25-43:3).

28. Sometime after February 8, 2008, Cardwell executed ten promissory notes for the money she had transferred to Healy Spring between March 31, 1975 and February 8, 2008 (collectively referred to as the "Promissory Notes"). (Ex. B - Cardwell Dep., 44:11-14; 49:7-11; Ex. D – Promissory Notes).

29. The Promissory Notes were drafted by Cardwell's counsel and Cardwell signed all ten promissory notes on the same day, however, the Promissory Notes were dated as of the date of the transfer of the money, not the date they were actually signed. (Ex. B - Cardwell Dep.,11:12-19; 19:14-20:12; 25:22-24; 33:7-9; 34:6-8; 35:7-13; 41:9-19; 44:9-14; 49:4-11).

30. Cardwell claims that a different note was entered into in 1975 to reflect the $117,635.00 she advanced to Healy Spring on March 31, 1975, but she did not produce a copy of this alleged note during discovery. (Ex. B - Cardwell Dep., 12:4-11).

31. The Promissory Notes did not have a fixed date or schedule for payments. Rather, they state that the indebtedness would be paid "at such place as the Holder may from time to time in writing designate." (Ex. D – Promissory Notes).

32. Although the Promissory Notes all state that the amounts loaned would bear interest "at the rate of ten percent (10%) per annum compounded annually," interest was rarely, if ever, paid. (Ex. B - Cardwell Dep., 17:19-25; 23:3-11; 27:21-24; 30:4-7; 31:20-24; 35:23-25; 37:23-25; 44:1-3; Ex. D – Promissory Notes).

33. Healy Spring would not have been able to pay its bills if Cardwell had not advanced monies to the company and would not have been able to survive. (Ex. B - Cardwell Dep., 23:12-24:13; 28:3-4; 29:4-11; 31:5-8; 33:20-22; 35:2-3; 36:25-37:5; 40:21-41:5; 43:6-14).

34. Healy Spring's tax return for tax year ending September 30, 2007 reflect $40,000.00 in loans to shareholders. (Ex. B - Cardwell Dep., 62:10-17; Ex. F – Healy Spring's 2006 tax returns, Schedule L).

35. While Cardwell testified that she received some unknown amount in repayment of the March 31, 1975 promissory note, she testified that she did not receive any repayment on the other nine promissory notes. (Ex. B - Cardwell Dep., 17:8-18; 22:21-23:2; 27:15-20; 29:22-30:3; 31:17-24; 35:18-22; 37:20-22; 43:23-25).

36. Healy Spring repaid Cardwell's advances only when it had cash available. (Ex. B - Cardwell Dep., 18:12-18).

37. Cardwell made four separate advances totaling $41,500.00 to Healy Spring after Healy Spring had ceased operations on November 7, 2007, and had let go of its last employees. (Ex. B - Cardwell Dep., 8:1-8; 40:23-41:1; 43:9-11; Ex. D – Promissory Notes).

38. All of the Promissory Notes were executed by Cardwell, as Holder and as Borrower, in her capacity as an officer of Healy Spring. (Ex. B - Cardwell Dep., 10:17-11:6; 18:25-19:13; 25:11-21; 28:13-24; 30:16-25; 32:19-33:3; 34:12-35:1; 36:11-21; 40:6-16;42:14-24; Ex. D – Promissory Notes).

39. Healy Spring did not try to obtain financing from outside lending institutions prior to receiving any of the advances from Cardwell as evidenced by the Promissory Notes because Healy Spring knew that it would not find a lender willing to loan the money. (Ex. B - Cardwell Dep., 23:19-24; 28:5-8; 29:12-17; 31:9-16; 33:23-25; 35:4-6; 37:16-19; 41:6-8; 43:19-22).

40. No outside lending institution would have loaned the money to Healy Spring because of its precarious financial condition. (Ex. B - Cardwell Dep., 23:25-26:7).

41. Healy Spring never established a policy or provision to repay the advances evidenced by the Promissory Notes. (Ex. B - Cardwell Dep., 45:23-46:4).

42. Healy Spring paid several of its creditors, including unsecured creditors before Cardwell was repaid a portion of the advances evidenced by the Promissory Notes. (Ex. B - Cardwell Dep., 39:4-16; 41:2-5; 43:6-19).

43. Cardwell and Healy Spring entered into a security agreement ("Security Agreement") dated February 15, 2008. (Ex. B - Cardwell Dep., 54:14-55:3; Ex. E – Security Agreement).

44. Pursuant to the Security Agreement, Healy Spring granted to Cardwell a security interest in the following assets and property of Healy Spring:

> All equipment, inventory, supplies, accounts receivable and the proceeds therefrom, equipment, furniture, customer lists and all other assets, tangible or intangible of whatever kind and nature, together with any additions and accessions thereto, together with all proceeds of the same and disposition of any of the property described herein, and all accounts receivable, and the proceeds therefrom, resulting from any such sale.

(Ex. E – Security Agreement, p. 1).

45. Healy Spring did not execute a mortgage in connection with the real property owned by Healy Spring. (Ex. G – Cardwell's Response to Plaintiffs' First Request for Production of Documents, No. 4).

46. Healy Spring's equipment was sold after it had ceased operations to a former employee for $16,000 and the proceeds from the sale of the equipment went to Healy Spring to pay outstanding bills, and not to Cardwell. (Ex. B - Cardwell Dep., 38:11-39:15).

47. Despite the Security Agreement, Cardwell did not receive any of the proceeds from the sale of the equipment. (Ex. B - Cardwell Dep., 38:11-39:15).

**D. Transfer of the Central Avenue Property**

48. At the time the Fund's lawsuit was filed against Healy Spring, the company's only remaining asset, the land and building located at 990 Central Avenue NE, Minneapolis, Minnesota (the "Central Avenue Property"), from which Healy Spring formerly operated. (Ex. B - Cardwell Dep., 65:9-19; 66:25-67:3; 68:3-5).

49. On May 15, 2008 (*i.e.,* one day after Cardwell was served with the summons and complaint in the Healy Spring lawsuit), Cardwell caused Healy Spring to transfer the Central Avenue Property to herself. (Ex. B - Cardwell Dep., 66:17-23; Ex. H – Warranty Deed).

50. On September 26, 2008, Cardwell sold the Central Avenue Property for a sale price of $495,000.00 and retained $332,330.17 of the proceeds for herself. (Ex. B - Cardwell Dep.,68:19-69:6; 70:23-71:14; Ex. I – Seller's Closing Statement, p. 1). Approximately

$120,000 of the proceeds from the sale went to paying off a Wells Fargo Bank mortgage and another $43,000 went towards taxes, fees and costs. (Ex. I – Seller's Closing Statement, p. 1).

51. Cardwell testified that she transferred the Central Avenue Property to herself in partial satisfaction of the outstanding Promissory Notes. (Ex. B - Cardwell Dep., 66:25-67:5).

Respectfully submitted,

/s/ Rebecca K. McMahon
Rebecca K. McMahon (ARDC #06290192)
CENTRAL STATES FUNDS
Law Department
9377 W. Higgins Road, 10th Floor
Rosemont, IL 60018
(847) 939-2477
rmcmahon@centralstatesfunds.org

March 18, 2014

<u>MINUTES OF ACTIONS TAKEN IN WRITING WITHOUT A</u>

<u>MEETING OF THE STOCKHOLDERS AND DIRECTORS OF</u>

<u>HEALY SPRING CO., A MINNESOTA CORPORATION AS OF</u>

<u>MARCH 31, 1975</u>

Phillip H. Cardwell and E. Louise Cardwell, Stockholders-Directors and John R. Cardwell, Director of Healy Spring Co., do hereby take the following actions in writing without a meeting pursuant to the Minnesota Business Corporation Act:

> RESOLVED, that the following described loan arrangements shall supersede earlier agreements and are in the best interest of the Corporation, and
>
> RESOLVED, that for its lawful corporate needs and purposes the Corporation reduce the sum to be borrowed from the Summit State Bank of Richfield from $100,000 to the sum of $80,000 with interest at the rate of 11½% per annum, payable in 15 years, and in return therefore give notes of the Corporation together with a mortgage upon the real estate.
>
> RESOLVED, that the corporation accept from Phillip H. Cardwell and E. Louise Cardwell a personal loan in the sum of $117,635 with interest at the rate of 10% per annum, payable in 20 years and in return give notes of the Corporation.
>
> BE IT FURTHER RESOLVED, that the above mentioned sums received from Summit State Bank of Richfield and Phillip H. Cardwell and E. Louise Cardwell be used to pay all costs of purchasing and building the real estate constituting the new facility of the Corporation.

_____
Phillip H. Cardwell, Stockholder-Director

_____
E. Louise Cardwell, Stockholder-Director

_____
John R. Cardwell, Director

Dated this 31st day of March, 1975

Ex. B



DEPOSITION EXHIBIT
Cardwell
#13